AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2/4/21

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Facebook account associated with the email address
hitchingsw@gmail.com and the vanity name of
whitchings that is stored at Facebook Inc.

)
)
)
)
)
)

Case No.     3:21-mj-44

Elizabeth Preston Deavers

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

### SEE ATTACHMENT A-2

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized):*

### SEE ATTACHMENT B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| SEE ATTACHMENT C-2 | |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Andrea R. Kinzig, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

GoTo Meeting

*(specify reliable electronic means)*

Date:     2-4-2021

*Judge's signature*

City and state:  Columbus, OH

Elizabeth A. Preston Deavers, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-2

### Property to Be Searched

Information associated with the Facebook account associated with the email address **hitchingsw@gmail.com** and the vanity name of **whitchings** that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California, 94025.

## ATTACHMENT B-2

### Particular Things to be Seized

I. **Information to be disclosed by Facebook Inc. (the "Provider")**

To the extent that the information described in Attachment A-2 is within the possession, custody, or control of the Provider, including any messages, records, files, logs, or information that have been deleted but are still available to the Provider, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each user ID listed in Attachment A-2:

    (a)    All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    (b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

    (c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

    (d)    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

    (e)    All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

    (f)    All "check ins" and other location information;

    (g)    All IP logs, including all records of the IP addresses that logged into the account;

    (h)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

    (i)    All information about the Facebook pages that the account is or was a "fan" of;

    (j)    All past and present lists of friends created by the account;

    (k)    All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)     The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within 14 days of the issuance of this warrant.  Notwithstanding 18 U.S.C. § 2252/2252A or any similar statute or code, the Provider shall disclose responsive data by sending it to the Federal Bureau of Investigation at 7747 Clyo Road, Centerville, Ohio, 45459, or making the data available to the Federal Bureau of Investigation via Facebook Inc.'s electronic portal.

## II.  Information to be seized by the government

Items evidencing violations of 18 U.S.C. §§ 2252(a)(2) and (b)(1) and 2252A(a)(2) and (b)(1) (receipt and distribution of child pornography), 18 U.S.C. §§ 2252(a)(4)(B) and (b)(1) and 2252A(a)(5)(B) and (b)(1) (possession of child pornography), and 21 U.S.C. §844 (possession of controlled substances) involving WILLIAM HITCHINGS from January 1, 2015 to the present, including but not limited to the following:

1. Any visual depictions and records related to the possession, receipt, and distribution of child pornography.

2. Any images or videos depicting child pornography.

3. Any and all child erotica, including images and videos of children that are not sexually explicit, drawings, sketches, fantasy writings, diaries, and sexual aids.

4. Any Internet or search history indicative of searching for child pornography or content involving children.

5. Any communications with others in which child exploitation materials and offenses are discussed and/or traded.

6. Any communications with minors, and any identifying information for these minors.

7. Any information related to the use of aliases.

8. Evidence of utilization of email accounts, social media accounts, online chat programs, and peer-to-peer file sharing programs.

9. Any records related to the possession of controlled substances.

10. Any Internet or search history indicative of searching for controlled substances.

11. Any images or videos depicting controlled substances and drug paraphernalia (such as scales, packaging materials, bongs, etc.).

12. Any communications about the purchase, acquisition, sale, or transfer of controlled substances.

13. Evidence of utilization of telephone accounts, Internet Service Providers, and financial accounts, including but not limited to monthly billing statements;

14. Any information related to Internet Protocol (IP) addresses accounts accessed by the accounts.

15. Information relating to who created, used, or communicated with the account, including records about their identities and whereabouts.

## ATTACHMENT C-2

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §2252(a)(4)(B) & (b)(1) | Possession of Child Pornography |
| 18 U.S.C. §2252A(a)(5)(B) & (b)(1) | Possession of Child Pornography |
| 18 U.S.C. §2252(a)(2) & (b)(1) | Receipt and Distribution of Child Pornography |
| 18 U.S.C. §2252A(a)(2) & (b)(1) | Receipt and Distribution of Child Pornography |
| 21 U.S.C. §844 | Possession of Controlled Substances |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Andrea R. Kinzig, being duly sworn, depose and state the following:

## INTRODUCTION

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been so employed since 2005. I am currently assigned to the Dayton, Ohio Resident Agency of the Cincinnati Field Office. In connection with my official duties, I investigate violations of federal criminal laws, including offenses pertaining to the illegal production, distribution, receipt, and possession of child pornography (in violation of 18 U.S.C. §§ 2252(a) and 2252A) and coercion and enticement (in violation of 18 U.S.C. §2422). I have received training in the area of child pornography and child exploitation and have observed and reviewed numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in various forms of media, including computer media.

2. Along with other agents, officers, and investigators of the FBI, I am currently involved in an investigation of suspected child pornography and drug offenses committed by WILLIAM SIDNEY HITCHINGS V (hereinafter referred to as "HITCHINGS"). This Affidavit is submitted in support of Applications for search warrants for the following:

    a. Information associated with the Google account associated with the email address **hitchingsw@gmail.com** that is stored at premises controlled by Google LLC (as more fully described in Attachment A-1); and

    b. Information associated with the Facebook account associated with the email address **hitchingsw@gmail.com** and the vanity name of **whitchings** that is stored at premises controlled by Facebook Inc. (as more fully described in Attachment A-2).

3. The purpose of the Applications is to search for and seize evidence of suspected violations of the following:

    a. 18 U.S.C. §§ 2252(a)(4)(B) and (b)(1) and 2252A(a)(5)(B) and (b)(1), which make it a crime to possess child pornography;

    b. 18 U.S.C. §§ 2252(a)(2) and (b)(1) and 2252A(a)(2) and (b)(1), which make it a crime to distribute and receive child pornography through interstate commerce; and

    c. 21 U.S.C. § 844, which make it a crime to possess controlled substances.

4. The items to be searched for and seized are described more particularly in Attachments B-1 through B-2 hereto and are incorporated by reference.

1

5.   As part of the investigation, I have reviewed documentation and reports provided by and discussed information with other agents, officers, and investigators involved in the investigation. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge.

6.   This Affidavit does not contain every fact known to the investigation, but only those deemed necessary to demonstrate sufficient probable cause to support the searches of the above noted accounts (as described in Attachments A-1 through A-2).

7.   As a result of the instant investigation described more fully below, there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; and property designed for use, intended for use, or used in committing a crime of violations of federal law; including violations of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(1), 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(1), 18 U.S.C. §§ 2252(a)(2) and (b)(1), 18 U.S.C. §§ 2252A(a)(2) and (b)(1), and 21 U.S.C. § U.S.C. § 844, are present in the information associated with the above noted accounts (as described in Attachments A-1 through A-2).

## JURISDICTION

8.   This court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PERTINENT FEDERAL CRIMINAL STATUTES

9.   18 U.S.C. § 2252(a)(2) and (b)(1) states that it is a violation for any person to knowingly receive or distribute any visual depiction using any means or facility of interstate or foreign commerce or that has been mailed, shipped, or transported in or affecting interstate or foreign commerce or which contains materials which have been mailed or so shipped or transported by any means, including by computer, or to knowingly reproduce any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

10.   18 U.S.C. § 2252A(a)(2) and (b)(1) states that it is a violation for any person to receive or distribute – (A) any child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer; and (B) any material that contains child pornography that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

2

11.    18 U.S.C. § 2252(a)(4)(B) and (b)(1) states that it is a violation for any person to knowingly possess, or knowingly access with the intent to view, one or more matters which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

12.    18 U.S.C. § 2252A(a)(5)(B) and (b)(1) states that it is a violation for any person to knowingly possess, or knowingly access with intent to view, any book, magazine, periodical, film, videotape, computer, disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

13.    21 U.S.C. § 844 states that it is a violation for any person to knowingly or intentionally possess a controlled substance unless such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice, or except as otherwise authorized by this subchapter or subchapter II of this chapter.

## BACKGROUND INFORMATION

### Definitions

14.    The following definitions apply to this Affidavit and Attachments B-1 through B-2 to this Affidavit:

   a.    **"Child Pornography"** includes the definition in Title 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

   b.    **"Visual depictions"** include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image (see 18 U.S.C. § 2256(5)).

3

c.    **"Minor"** means any person under the age of eighteen years (see 18 U.S.C. § 2256(1)).

d.    **"Sexually explicit conduct"** means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person (see 18 U.S.C. § 2256(2)).

e.    **"Internet Service Providers"** or **"ISPs"** are commercial organizations which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

f.    An **"Internet Protocol address"**, also referred to as an **"IP address"**, is a unique numeric address that computers or electronic devices use in order to communicate with each other on a computer network utilizing the Internet Protocol (IP) standard. Every computer or device connected to the Internet is referenced by a unique IP address. An IP address can be thought of as the equivalent to a street address or a phone number, just as each street address and phone number uniquely identifies a building or telephone. IP addresses are composed of four sets of digits known as "octets," ranging in value from 0-255, separated by decimal points. An example of an IP address is 192.168.10.102. There are two types of IP addresses; static and dynamic. A static address is permanently assigned to a particular device and as a practical matter never changes. A dynamic address provided by an Internet service provider to a client computer is valid only for the duration of the session that the client computer is connected to the Internet (or other network).

g.    **"Hyperlink"** (often referred to simply as a "link") refers to a navigation element in a web page or document that automatically brings the referred information (a.k.a. "resource") to the user when the navigation element is selected by the user. Hyperlinks are part of the foundation of the World Wide Web, but are not limited to a website for HTML.

4

h.    **"Website"** consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

i.    **"Social Media"** is a term to refer to websites and other Internet-based applications that are designed to allow people to share content quickly, efficiently, and on a real-time basis. Many social media applications allow users to create account profiles that display users' account names and other personal information, as well as to exchange messages with others. Numerous forms of social media are presently available on the Internet.

j.    **"Exchangeable image file format"**, also referred to as **"EXIF data"**, is a standard that specifies the formats for images, sound, and ancillary tags used by digital cameras (including smartphones), scanners, and other systems handling image and sound files stored by digital cameras. Most new digital cameras use the EXIF annotation, storing information on images such as shutter speed, exposure compensation, F number, metering system used, if a flash was used, ISO number, date and time the image was taken, etc.

k.    **"Metadata"** is data that provides information about other data. For computer files, metadata can be stored within the file itself or elsewhere. Metadata for computer files includes the file name, the file type, where it is stored (*i.e.*, the file path), when it was created, when it was last modified and accessed, the file size, and other information.

l.    **"Uniform Resource Locator"** or **"Universal Resource Locator"** or **"URL"** is the unique address for a file that is accessible on the Internet. For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line. Additionally, any file within that website can be specified with a URL. The URL contains the name of the protocol to be used to access the file resource, a domain name that identifies a specific computer on the Internet, and a pathname, a hierarchical description that specifies the location of a file in that computer.

m.    The terms **"records,"** **"documents,"** and **"materials,"** as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs),

Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

### Collectors of Child Pornography

15.    Based upon my knowledge, training, and experience in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the collection of child pornography (hereafter "collectors"):

a.    Collectors may receive sexual stimulation and satisfaction from contact with children, or from having fantasies of children engaged in sexual activity or suggestive poses, or from literature describing such activity.

b.    Collectors may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Collectors typically use these materials for their own sexual arousal and gratification. Collectors often have companion collections of child erotica. Child erotica are materials or items that are sexually suggestive and arousing to pedophiles, but which are not in and of themselves obscene or pornographic. Such items may include photographs of clothed children, drawings, sketches, fantasy writings, diaries, pedophilic literature and sexual aids.

c.    Collectors who also actively seek to engage in sexual activity with children may use these materials to lower the inhibitions of a child they are attempting to seduce, convince the child of the normalcy of such conduct, sexually arouse their selected child partner, or demonstrate how to perform the desired sexual acts.

d.    Collectors almost always possess and maintain their "hard copies" of child pornographic images and reference materials (e.g., mailing and address lists) in a private and secure location. With the growth of the Internet and computers, a large percentage of most collections today are in digital format. Typically these materials are kept at the collector's residence for easy access and viewing. Collectors usually place high value on their materials because of the difficulty, and legal and social danger, associated with acquiring them. As a result, it is not uncommon for collectors to retain child pornography for long periods of time, even for years. Collectors often discard child pornography images only while "culling" their collections to improve their overall quality.

e.    Collectors also may correspond with and/or meet others to share information and materials. They may save correspondence from other child pornography

6

distributors/collectors, including contact information like email addresses, and may conceal such correspondence as they do their sexually explicit material.

f.   Collectors prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

g.   Subscribers to websites that are primarily designed to provide child pornography have a strong likelihood of being collectors of child pornography. This high degree of correlation between subscription and collection behavior has been repeatedly confirmed during several recent nationwide law enforcement initiatives.

<u>Google Services</u>

16.   Google LLC is a multi-national corporation with its headquarters located in Mountain View, California. The company specializes in Internet-related products and services, including an Internet search engine (www.google.com), productivity tools such as email service (gmail), and enterprise products such as Google Search Appliance.

17.   Google Photos is a photograph and video sharing and storage service provided by Google LLC, located at photos.google.com. It allows users to back-up their photographs and videos so they can be accessed on any cellular telephone, tablet, or computer. It also allows users to pool their photographs and videos together with others into shared albums. Photographs and videos can be organized and searched by places and things in them.

18.   Google+ is a social networking and identity service website owned and operated by Google LLC, located at www.plus.google.com. Common features include the following:

a.   <u>Profiles</u>: Users can establish profile pages to maintain personal information, similar to the Facebook and MySpace social networking sites.

b.   <u>Circles</u>: Google+ allows users to establish "circles", which enables them to organize people into groups for sharing across various Google products and services. This service replaces the typical "Friends" list function used by sites such as Facebook and MySpace.

c.   <u>Communities</u>: Communities allow users with common interests to communicate with each other.

d.   <u>Photos</u>: Google+ allows users to post, back-up, and share photographs. Users can also make comments on photographs posted by other users.

e.   <u>Hangouts</u>: Hangouts are places used to facilitate group video chat. Only Google+ users can join such chats.

    f.    <u>Messenger</u>: Messenger is a feature available to Android, iPhone, and SMS devices for communicating through instant messaging within Circles.

19.    Google Web and App History is a feature of Google Search in which a user's search queries and results and activities on other Google services are recorded. The feature is only available for users logged into a Google account. A user's Web and App History is used to personalize search results with the help of Google Personalized Search and Google Now.

20.    Google Drive is a file storage and synchronization service provided by Google LLC, located at www.drive.google.com. This service provides cloud storage, file sharing, and collaborative editing capabilities. It offers 15 GB of online storage space, which is usable across Google Drive, Gmail, and other Google services.

21.    Google Android Backup is a service provided by Google LLC to backup data connected to users' Google accounts. The service allows users to restore data from any Google account that has been backed up in the event that the users' devices are replaced or erased. Data that can be backed up includes Google Calendar settings, WiFi networks and passwords, home screen wallpapers, Gmail settings, applications installed through Google Play, display settings, language and input settings, date and time, and third party application settings and data.

### Email Accounts

22.    Google LLC is a multi-national corporation with its headquarters located in Mountain View, California. In my training and experience, I have learned that Google LLC provides a variety of online services, including electronic mail ("email") access, to the public.

23.    Google LLC allows subscribers to obtain email accounts at the domain name gmail.com, like the accounts listed in Attachment A-1. Subscribers obtain accounts by registering with Google LLC. During the registration process, Google LLC asks subscribers to provide basic personal information. Therefore, the computers of Google LLC are likely to contain stored electronic communications (including retrieved and unretrieved email for Google LLC subscribers) and information concerning subscribers and their use of Google LLC services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

24.    In general, emails that are sent to Google LLC subscribers are stored in the subscriber's "mail box" on Google LLC's servers until the subscriber deletes the email. If the subscriber does not delete the message, the messages can remain on Google LLC's servers indefinitely. Even if the subscriber deletes an email, it may continue to be available on Google LLC's servers for a certain period of time.

25. Google LLC subscribers can also store with the providers files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google LLC. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

26. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

27. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

28. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

29. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email

communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

### Facebook

30.    Facebook Inc. is a company based in Menlo Park, California. Facebook Inc. owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

31.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact email addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

32.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

33.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a

10

Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

34.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

35.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

36.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

37.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

38.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

39.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

40.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

41.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

42.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

43.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

44.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP)

12

addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

46. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## Background on Computer Encryption

47. Encryption is the process of taking plain text and scrambling it into an unreadable format called "cipher text". This helps protect the confidentiality of digital data either stored on computer systems or transmitted through a network like the Internet. When the intended recipient accesses the message, the information is translated back to its original form. This is called decryption. To unlock the message, both the sender and recipient have to use a "secret" encryption key – a collection of algorithms that scramble and unscramble data back to its readable format.

48. Various encryption software is currently available that can encrypt individual files, folders, volumes, or entire disks within a computer, as well as USB flash drives and files stored in the cloud. There are two main methods of encryption: symmetric encryption, which involves securing data with a single private key, and asymmetric encryption, which uses a combination of multiple keys that are both public and private.

49. Based on my training and experience, I know that individuals involved in child pornography offenses often utilize encryption on their computer and electronic media to protect their child pornography files from being discovered by their associates and law enforcement officers. When encryption is utilized by the subjects, law enforcement officers typically cannot access the encrypted containers without gaining access to the passwords.

<u>NCMEC and Cyber Tipline Reports</u>

50.     The National Center for Missing and Exploited Children (commonly known as "NCMEC") was founded in 1984 to serve as a clearinghouse on issues related to missing and sexually exploited children. It is currently authorized by Congress to perform 19 programs and services to assist law enforcement, families, and professions find missing children, reduce child sexual exploitation, and prevent child victimization.

51.     As part of its functions, NCMEC administers the Cyber Tipline. The Cyber Tipline receives leads and tips from the public and Electronic Service Providers regarding suspected crimes of sexual exploitation committed against children. Electronic Service Providers are required by law to report apparent child pornography to law enforcement via the Cyber Tipline. Analysts review these tips and refer them to the appropriate federal, state, and local law enforcement authorities. Many states utilize Internet Crimes Against Children (ICAC) task forces to serve as the intake organizations for the Cyber Tipline reports. These ICAC's review the Cyber Tipline reports received from NCMEC and assign them to the applicable law enforcement agencies. In Ohio, the ICAC in Cuyahoga County serves as this intake organization.

<u>Cloud Storage</u>

52.     Cloud computing has become an increasingly popular way for both individuals and businesses to store and maintain data. Cloud computing utilizes computer resources delivered as a service over a network (typically the Internet). Resources are distributed across a variety of remote data centers in different locations.

53.     Cloud computing has become an increasingly popular way for both individuals and businesses to store and maintain data. Cloud computing utilizes computer resources delivered as a service over a network (typically the Internet). Resources are distributed across a variety of remote data centers in different locations. The following terms relate to the use of cloud computing:

a.     "Cloud" is a generic term that refers to a network where the physical location and inner workings are abstracted away and unimportant to the usage. "The cloud" was first used to describe telecommunication networks, where the consumer was blissfully unaware of the inner workings of how their telephone conversation was transmitted to the remote end. The term was later used to describe computer networks, and ultimately to describe the Internet specifically. Knowing the physical location of a website is unimportant to using that service. Cloud computing also takes advantage of this definition of cloud, as it is also a service connected to a network, often the Internet. However, cloud computing offers specific services whereby customers rent remote computing resources such as processing power or data storage, and provision those resources themselves.

14

b.    "Cloud computing" is a model for enabling ubiquitous, convenient, on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or service provider interaction.

c.    "Cloud Service Provider" (CSP) is the entity that offers cloud computing services. CSP's offer their customers the ability to use infrastructure, platform, or software as a service. These services may include offerings such as remote storage, virtual machines, or Web hosting. Service is billed as a utility based on usage. CSP's maintain records pertaining to the individuals or companies that have subscriber accounts with it. Those records could include identifying and billing information, account access information in the form of log files, account application information, and other information both in computer data format and in written record format. CSP's reserve and/or maintain computer disk storage space on their computer system for the use of the cloud service subscriber for both temporary and long- term storage of electronic data with other parties and other types of electronic data and files. Such temporary, incidental storage is defined by statute as "electronic storage," and the provider of such a service is an "electronic communications service" provider. A cloud service provider that is available to the public and provides long-term storage services to the public for electronic data and files, is providing a "remote computing service." CSP's may be able to provide some of the following, depending on the type of services they provide: NetFlow, Full Packet Captures, Firewall and Router Logs, Intrusion Detection Logs, Virtual Machines, Customer Account Registration, Customer Billing Information.

d.    "Virtual Machine" (VM) is a system where the hardware is virtual rather than physical. Virtualization is a technique whereby special software, called the hypervisor, can run many virtual (rather than physical) machines. The hardware on the single machine is emulated so that each virtual instance of a computer, called a VM, does not require dedicated physical hardware, but each VM believes it has its own hardware. The hypervisor has special access to control all of the virtual guests, but it should also be able to isolate the guests from each other.

e.    "NetFlow Records" are collections of network statistics collected by a service provider about traffic flows. A traffic flow is a sequence of data packets from a source to a destination. NetFlow is collected when it is impractical to collect all of the data packets for a flow. Providers may use these logs for quality control, security, or billing. For any particular network flow, NetFlow can include the source and destination IP addresses, network ports, timestamps, and amount of traffic transferred. A provider may only collect a sample of all possible sessions, and may only store the NetFlow for a short time.

54.  Dropbox is an on-line service that allows its users to store files on Dropbox Inc.'s servers. The service is offered by Dropbox Inc., a company based in San Francisco, California.

55.    Mega is a cloud storage and file hosting service offered by Mega Limited, an Auckland, New Zealand-based company. Mega is known for its security feature where all files are end-to-end encrypted locally before they are uploaded. This encryption prevents anyone from accessing the files without knowledge of the pass key.

56.    Mega provides its users with the ability to share files or folders with others. One means of sharing files or folders is by creating a "sharing link". A sharing link creates a URL to store the file(s) or folder(s) so that others can access, view, and/or download them. These sharing links can be sent to others via email, Facebook, Twitter, instant message, or other means. Users can limit who can access their sharing links by setting passwords and/or expiration dates for the links.

57.    Based on my training and experience, I know that individuals involved in child pornography offenses frequently store their child pornography files in cloud storage accounts such as Mega and Dropbox. I also know, based on my training and experience, that individuals often trade child pornography files by sending sharing links to their cloud storage accounts.

Verizon Location Records and Cloud Data

58.    Verizon provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

59.    Verizon allows customers to back up and store the contents of their cellular telephones and tablets to a Verizon Cloud. Contents that can be backed up to the Verizon Cloud include messages, images, videos, documents, contacts, and call logs. The Verizon Cloud allows users to wirelessly back up and synch contents between their cellular telephones, tablets, computers, and other devices.

60.    Synchronoss Technologies Inc. is a software services company that provides digital, cloud, messaging, and Internet of Things (IoT) platforms to various companies. Verizon has a contract with Synchronoss Technologies Inc. to power, administer, and maintain the Verizon Cloud. Synchronoss Technologies maintains the contents of the Verizon Cloud accounts.

16

However, Verizon maintains subscriber information, transactional records, and location information for the telephone accounts.

## Other Social Media Applications

61.     Skype owns and operates a communication service that transmits voice calls, video, and messages over the Internet. In May 2011, Skype was acquired by Microsoft Corporation, a company based in Redmond, Washington.

62.     Skype users can make and receive local, long distance, and international phone calls; participate in video chats or send and receive video messages; send and receive short message system (SMS) text messages; and send and receive electronic files including documents, pictures, audio, and video.

63.     Skype has a feature that provides its users with the ability to exchange Private Conversations. This Private Conversations feature allows users to have end-to-end encrypted audio calls and to exchange end-to-end encrypted text messages, images, videos, and audio files. The contents of these conversations are hidden in the chat notifications in order to keep the information that users share private.

64.     Telegram Messenger is a cloud-based instant messaging and voice over IP service that was developed by Telegram Messenger LLP, a privately-held company registered in London, United Kingdom. The application can be downloaded and used free of charge on smartphones, tablets, and computers.

65.     Telegram Messenger allows users to exchange messages, photographs, videos, and files of any type. Users can also create groups for up to 200,000 people or channels for broadcasting to unlimited audiences. In addition, Telegram allows users to make voice calls to other users.

66.     Kik is a cross-platform instant messenger application available on smartphones. The application is administered by Kik Interactive Inc., a company based in Ontario, Canada. The application allows users to exchange text-based conversations with one another and to share media such as photos, YouTube videos, and other content. Each Kik user has an account name, which is unique to that user, as well as a profile name.

67.     Wickr is an instant messenger application administered by Wickr Inc., a company based in San Francisco, California. The application allows users to exchange end-to-end encrypted and content-expiring messages, photographs, videos, and other file attachments.

68.     Based on my training and experience, I know that individuals involved in child pornography offenses often utilize various social media and messenger applications to trade child pornography files and to communicate with other offenders and victims.

## FACTS SUPPORTING PROBABLE CAUSE

### Information from Cooperating Witness

69.     Beginning in or around December 2019, I have been involved in an investigation of child pornography offenses committed by an adult male who will be referred to for purposes of this Affidavit as "Adult Male A".  Adult Male A has pled guilty in the United States District Court for the Southern District of Ohio to one count of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and (e).  As part of his plea agreement, Adult Male A admitted that he had produced child pornography in 2019 and that he had viewed child pornography files depicting other children.

70.     As part of the investigation, Adult Male A was interviewed on two occasions in March 2020 and May 2020.  During these interviews, Adult Male A identified that he had received child pornography files from an individual who lived in Troy, Ohio.  During the first interview, Adult Male A referred to this individual as "WILLIAM" and advised that WILLIAM's last name might be HITCHINGS or HIGGINS.  During the second interview, Adult Male A advised that this individual's name was either "WILL HIGGINS" or "WILL HITCHINGS".

   a.     I know, based on my training and experience, that WILL is a common nickname for WILLIAM.  It is common, in my experience, for individuals to transpose nicknames with true names.

   b.     Based on the information Adult Male A provided about the individual who sent him the child pornography, there is probable cause to believe that Adult Male A was referring to HITCHINGS.

71.     During the first interview in March 2020, Adult Male A minimized his involvement in child pornography activities.  He only admitted that he received and viewed child pornography on a limited number of occasions, and he denied that he produced child pornography.  Below is a summary of information that Adult Male A provided about HITCHINGS during the first interview:

   a.     Adult Male A reported that he received at least one video depicting child pornography from HITCHINGS on a past occasion.  HITCHINGS sent this video to Adult Male A via Telegram.  Adult Male A acknowledged that there may have been additional occasions in which HITCHINGS sent him (Adult Male A) child pornography files.

   b.     Adult Male A stated that he did not want to get HITCHINGS in trouble, but that HITCHINGS was "into" child pornography.

18

     c.     Adult Male A had been to HITCHINGS' residence in the past.  Adult Male A saw HITCHINGS view child pornography and bestiality files on a computer that was in HITCHINGS' residence.

     d.     HITCHINGS had a large rack of computers inside of his residence.

     e.     Adult Male A described HITCHINGS' residence as being on State Route 41 (also known as Main Street) near a school in Troy, Ohio.

72. Adult Male A was interviewed again in May 2020 pursuant to his arrest.  During this interview, Adult Male A admitted that he had produced, received, and distributed child pornography files.  He also provided additional information about HITCHINGS during this interview.  Below is a summary of information that Adult Male A provided about HITCHINGS during the second interview:

     a.     On the first occasion that Adult Male A was at HITCHINGS' residence, HITCHINGS took Adult Male A into the basement.  HITCHINGS had a black rack of computers in the basement.  HITCHINGS asked if Adult Male A wanted to see some "crazy" videos and then proceeded to show Adult Male A videos depicting bestiality and child pornography.

     b.     Over one year ago, HITCHINGS gave Adult Male A a desktop computer that was "packed" full of child pornography and adult pornography files.  The pornography included children having sex with other children and animals.  Adult Male A later destroyed the hard drive that was in this desktop computer.

     c.     HITCHINGS also at one time gave Adult Male A a laptop computer that contained child pornography files.

     d.     HITCHINGS previously told Adult Male A that there was good child pornography on Telegram.

     e.     Adult Male A again described HITCHINGS' residence as being on State Route 41 near a school and where the road curved.  Adult Male A identified that HITCHINGS lived with his boyfriend, CHRIS (no last name provided), and HITCHINGS' mother.

73. It was noted that during both of the interviews of Adult Male A, he sometimes talked about how his deceased relatives and God spoke to him.  However, Adult Male A provided information about his child pornography activities that was consistent with other information obtained pursuant to the investigation, including information provided by victims and cooperating witnesses, information obtained from Adult Male A's electronic accounts pursuant to search warrants, and other information obtained pursuant to the investigation.  It

is therefore reasonable to believe that the information Adult Male A provided about HITCHINGS is credible.

74.    It was also noted that Adult Male A provided more information about his own child pornography activities as well as HITCHINGS' child pornography activities during the second interview (which was conducted pursuant to Adult Male A's arrest). Based on my training and experience, I know that it common for individuals to withhold information about their criminal activities when first contacted by law enforcement officers. Individuals often withhold such information as a means to protect themselves and their co-conspirators from criminal culpability. It is not uncommon for such individuals to be more truthful during subsequent interviews when they are faced with additional evidence and/or during interviews conducted after they have been arrested.

### Cyber Tipline Report

75.    As part of the investigation, I have learned that Synchronoss Technologies Inc. filed a report to NCMEC's Cyber Tipline on or around November 23, 2020, regarding approximately six suspected child pornography or child exploitation files located in a Verizon Cloud account associated with telephone number 937-554-7700 (hereinafter referred to as the "TARGET CELL PHONE"). Synchronoss Technologies Inc. provided these approximately six suspected child pornography or child exploitation files to NCMEC as part of its Cyber Tipline report.

76.    NCMEC forwarded Synchronoss Technologies Inc.'s Cyber Tipline report, along with the suspected child pornography or child exploitation files, to me for further investigation. Based on my review of the files and my training and experience, I believe that approximately six of the files depict child pornography. By way of example, three of the files are described as follows:

    a.    a968ea8e58fa4b458ed2f98b600f626f_file1.jpg: The file is an image that depicts what appears to be a nude pre-pubescent white male child who is lying on his back with his legs spread apart, exposing his nude genitals to the camera. What appears to be an adult white male (whose face is not captured in the image) appears to be urinating on the child.

    b.    a968ea8e58fa4b458ed2f98b600f626f_file2.jpg: The file in an image that depicts what appears to be a nude pre-pubescent white male child performing fellatio on what appears to be an adult white male (whose face is not captured in the image).

    c.    a968ea8e58fa4b458ed2f98b600f626f_file3.jpg: The file is an image that depicts what appears to be two nude pre-pubescent white male children who are standing next to each other. One child is touching the other child's penis.

20

<u>Records Obtained Pursuant to Search Warrants and Subpoenas</u>

77.  On or around January 12, 2021, Synchronoss Technologies Inc. was served with a search warrant requesting the account contents of the Verizon Cloud account associated with the TARGET CELL PHONE (hereinafter referred to as the "SUBJECT VERIZON CLOUD ACCOUNT"). The account contents provided by Synchronoss Technologies Inc. in response to the search warrant included approximately seven documents, approximately 1,647 image files, and approximately 90 video files. Below is a summary of information noted regarding these files:

   a.  More than 450 of the image and video files depicted a male who appears to be HITCHINGS. These files included the following:

      i.  A number of the images and videos depicted HITCHINGS engaged in sexually explicit conduct. Some of the images and videos depicted HITCHINGS engaged in sexually explicit conduct with a dog.

      ii.  A number of the images and videos depicted HITCHINGS in what appears to be a basement. Numerous computer and electronic media (including computers, computer servers, computer hardware, and suspected surveillance systems) were depicted in the images and videos of HITCHINGS. HITCHINGS was depicted accessing these computer devices in some of the images and videos.

         1.  As noted above, Adult Male A reported that HITCHINGS had a large rack of computers in his basement.

      iii.  The EXIF data and metadata for the images and videos indicated that they were produced during the approximate time period of 2013 through 2020.

      iv.  The EXIF data indicated that the following devices were utilized to produce the images: a Motorola Moto z3 (the device associated with the TARGET CELL PHONE), a GoPro Hero 4, an LGE Nexus 4 cellular telephone, an LG Model LG-918 cellular telephone, a Kyocera Model E6830 cellular telephone, and nine different models of Samsung cellular telephones.

      v.  One image depicted HITCHINGS' Ohio driver's license.

   b.  One image depicted a screen print of what appears to be an order confirmation from an Internet-based purchase. This order confirmation listed HITCHINGS' name as the recipient along with the address of 924 East Main Street, Troy, Ohio (hereinafter referred to as the "SUBJECT PREMISES").

21

c.   Approximately three images depicted three packages from the United States Postal Service and United Parcel Service, all of which were addressed to HITCHINGS at the SUBJECT PREMISES. Approximately one image depicted a Packing List for an order, with HITCHINGS' name and the SUBJECT PREMISES listed as the recipient of the items on the document.

d.   In addition to the images and videos depicting HITCHINGS with computer devices, numerous other images and videos depicted computer and electronic media – including computers, computer servers, computer hardware, and surveillance systems. Some of the images depicted what appears to be monitoring screens for the surveillance cameras. Based on these images as well as other information obtained pursuant to the investigation, it appears that there were surveillance cameras that capture both the interior and exterior of HITCHINGS' residence, and that monitoring screens for these cameras were located both in the basement as well as the living room of the residence.

   i.   Based on my training and experience, I know that individuals involved in criminal activities often utilize surveillance cameras as a means to both protect their homes from thefts (such as thefts from other drug suppliers and drug users) and to monitor their homes for any potential contact with law enforcement officers.

e.   One image depicted what appears to be a screen print from an Internet website. This screen print listed the email address of w.hitchings@gmail.com.

f.   Approximately eight of the images depicted what appears to be child pornography. Six of these files were the same as those reported in the Cyber Tipline report filed by Synchronoss Technologies Inc. (as detailed above). The other two files are described as follows:

   i.   Felixxx_134931EdF_koz.jpg: The file is an image that depicts what appears to be a nude toddler-aged male child. The child's legs are straddled, exposing his nude genitals and anus to the camera. It appears that the child's legs are bound to his arms with black tape. What appears to be an adult white male (whose face is not captured in the image) is pointing his penis toward (or possibly touching his penis to) the child's leg and penis.

   ii.  Felixxx_143309iCO_6598.jpg: The file is an image that depicts what appears to be a pre-pubescent white male child. The child is turned upside down over the lap of what appears to be an adult white male (whose face is not captured in the image). The child's pants are pulled down, exposing his nude genitals and anus to the camera. The adult male's hands are touching

22

the child's legs and buttocks. The adult male's penis is exposed and pointed over the child's buttocks.

g.  Approximately two of the images depicted what appears to be nude pre-pubescent male children.

h.  At least approximately 22 of the images and videos depicted substances that, based on my training and experience, appear to be controlled substances. These files included the following:

   i.  Approximately 10 of the images and videos depicted a green leafy substance that appears consistent with marijuana. In one of the images, the substance was contained in an aluminum pan placed on a scale, with the scale showing a weight of 1.69 ounces.

   ii.  Approximately four of the images and videos depicted a crystal rocky substance that appears consistent with methamphetamine. One of these images depicted the crystal substance in a Tupperware container on a scale, with the scale showing a weight of 26.21 grams.

   iii.  Approximately five of the images and videos depicted a white rocky substance that appears consistent with crack cocaine or methamphetamine. Approximately two of the images depicted the substance in bags on a scale, with the scale showing weights of 2.04 grams and 0.79 grams.

   iv.  Approximately three videos depicted an individual smoking a substance from a bong.

   v.  The EXIF data for the images identified that they were produced with a Motorola Moto z3 cellular telephone (the device associated with the TARGET CELL PHONE) during the approximate time period of August 1, 2019 through November 1, 2020. The background shown in some of the images and videos appears to match the background of the basement where HITCHINGS was captured in other images and videos (as detailed above).

i.  One of the documents had a title on the first page of the following: "Dome Network Camera Quick Start Guide". This document provided instructions on how to use a dome surveillance camera. Another document was entitled "Family Fun". This document required a password to access it, and as such, could not be viewed.

78.  Based on the information contained in the SUBJECT VERIZON CLOUD ACCOUNT as well as other information detailed in the Affidavit, it appears that HITCHINGS has had access to numerous computer devices. It also appears that HITCHINGS has had access to

controlled substances. Based on my training and experience, the drug paraphernalia depicted in some of the images and videos (such as the scales and packaging materials) as well as the quantities and weights of some of the substances depicted in the images are consistent with someone who distributes controlled substances.

79. On or around January 12, 2021, Verizon was served with a search warrant requesting information associated with the TARGET CELL PHONE (including historical cell site records) for the time period of January 1, 2020 through January 12, 2021. Records received from Verizon in response to the search warrant included the following information:

    a. The TARGET CELL PHONE was subscribed to CHRISTOPHER SWEENEY (hereinafter referred to as "SWEENEY") at the SUBJECT PREMISES. The contact person listed for the account was HITCHINGS. HITCHINGS' address was also listed as being the SUBJECT PREMISES.

        i. Based on my training and experience, I know that individuals' telephone accounts may be subscribed to in other persons' names for a variety of reasons. One such reason could be that the individual has poor credit. Another reason could be that the person is on a "family plan" with a relative(s) or friend(s). Yet another reason could be to conceal the person's identity when the telephone account is being used in furtherance of illegal activities.

        ii. As detailed above, Adult Male A identified that HITCHINGS resided with his boyfriend, whose first name was "CHRIS". Based on the investigation conducted to-date, it appears that SWEENEY and HITCHINGS are involved in a romantic relationship.

    b. The device that utilized the TARGET CELL PHONE was a Motorola Moto z3 cellular telephone.

    c. The historical cell site records for the TARGET CELL PHONE identified that it was consistently in the area of the SUBJECT PREMISES, including during overnight hours.

    d. The historical cell site records were compared to two of the dates associated with the photographs of marijuana that were recovered from the SUBJECT VERIZON CLOUD ACCOUNT (as detailed above). This comparison provided the following information:

        i. The EXIF data for approximately four of the photographs of marijuana recovered from the SUBJECT VERIZON CLOUD ACCOUNT identified that the photographs were produced with a Motorola Moto z3 cellular

24

telephone on or around April 17, 2020 between approximately 8:31 a.m. and 11:46 a.m. One of these images depicted the marijuana on a scale (showing a weight of 1.69 ounces) and three of the images depicted the marijuana in an aluminum container and/or bowl. The cell site records identified that the TARGET CELLL PHONE was in the area of the SUBJECT PREMISES before, during, and after this approximate time period.

ii.    The EXIF data for approximately three of the photographs of marijuana recovered from the SUBJECT VERIZON CLOUD ACCOUNT identified that the photographs were produced with a Motorola Moto z3 cellular telephone on or around November 1, 2020 at approximately 8:07 p.m. The cell site records identified that the TARGET CELL PHONE was in the area of the SUBJECT PREMISES both before and after this approximate time – specifically, that it was in the area of the SUBJECT PREMISES at approximately 7:57 p.m. and 8:23 p.m.

iii.    Based on the information detailed above, as well as other information associated with the photographs (i.e., the items depicted in the background of the photographs), it is reasonable to believe that the quantities of marijuana from the images detailed above were photographed inside the SUBJECT PREMISES.

80.    As part of the investigation of Adult Male A, records were obtained from Facebook Inc. pursuant to a search warrant for his Facebook account. These records identified that Adult Male A had "blocked" another Facebook account containing a profile name of "WILLIAM HITCHINGS" and a user identification number of 100003978596185. On or around January 13, 2021, an administrative subpoena was served to Facebook Inc. requesting subscriber information for the Facebook account with the user identification number of 100003978596185, as well as logs of IP addresses utilized to access the account. Records received in response to the subpoena provided the following information:

a.    The account was created on or around June 20, 2012 in the name of "WILLIAM HITCHINGS". The vanity name for the account was whitchings.

b.    The email address associated with the account was **hitchingsw@gmail.com**. The telephone numbers associated with the account were the TARGET CELL PHONE and telephone number 305-587-8639.

c.    The log of IP addresses identified that the two most common IP addresses utilized to access the account were 71.66.197.244 and 71.66.197.242. The account was accessed as recently as on or around January 11, 2021.

25

81.   On or around January 14, 2021, an administrative subpoena was served to Google LLC requesting subscriber information for the w.hitchings@gmail.com Google account (the email address that appeared in one of the images recovered from the SUBJECT VERIZON CLOUD ACCOUNT), as well as logs of IP addresses utilized to access the account. Records received in response to the subpoena provided the following information:

  a.   The account was created on or around September 12, 2004 in the name of "WILLIAM HITCHINGS".

  b.   The alternate email address listed for the account was wenglebot@yahoo.com. The sign-in telephone number for the account as well as the recovery telephone number for the account were both listed as being the TARGET CELL PHONE.

    i.   Based on my training and experience, I know that many email providers such as Google LLC ask their users to provide alternate or recovery email addresses and telephone numbers when signing up for email accounts. The email providers send various notifications regarding the use of the users' email accounts to the alternate email addresses and telephone numbers to serve as security measures (i.e., to ensure that users' accounts have not been hacked or otherwise compromised). The email provider may also send to the user's alternate account a verification code that is needed to change a password to the user's account or complete another type of account maintenance.

  c.   The log of IP addresses identified that the two most common IP addresses utilized to access the account were 71.66.197.244 and 71.66.197.242 (the same IP addresses utilized to access the Facebook account associated with the email address **hitchingsw@gmail.com** and the vanity name of **whitchings**). The account was accessed as recently as on or around January 11, 2021.

82.   Charter Communications was identified as the Internet Service Provider for the IP addresses of 71.66.197.244 and 71.66.197.242 (the IP addresses utilized to access the w.hitchings@gmail.com Google account and the Facebook account associated with the email address **hitchingsw@gmail.com** and the vanity name of **whitchings**). On or around January 19, 2021, an administrative subpoena was served to Charter Communications requesting subscriber information for these IP addresses on a sample of two of the dates and times they were utilized to access the w.hitchings@gmail.com Google account. Records received from Charter Communications in response to the subpoena identified that they were both subscribed to East Main Technologies Inc. at the SUBJECT PREMISES.

83.   As part of the investigation, FBI investigators reviewed publicly available information on various social media websites and messenger applications for any possible accounts associated with the TARGET CELL PHONE and the email addresses w.hitchings@gmail.com, **hitchingsw@gmail.com**, and wenglebot@yahoo.com. Among

26

other accounts, investigators located the following:

a.  Google accounts were located that were associated with the email addresses **hitchingsw@gmail.com** and w.hitchings@gmail.com.  The profile pictures for these two accounts depicted a white male who appears to be HITCHINGS.

b.  A Skype account was located that was associated with the email address w.hitchings@gmail.com.  This Skype account contained a user name of "o0bc0o" and a profile name of "WILLIAM".

c.  A Telegram account was located that was associated with the TARGET CELL PHONE.  The account had a display name of "Bee Cee" and a user name of "o0bc0o" (the same user name as the Skype account listed above).  The account was presently offline.

    i.  As detailed above, Adult Male A identified that he received one or more child pornography files from HITCHINGS via Telegram.

84.  On or around January 20, 2021, Microsoft Corporation was served with a search warrant requesting information associated with the Skype account with the user name of o0bc0o and/or associated with the email address w.hitchings@gmail.com.  Records received from Microsoft Corporation in response to the search warrant included the following information:

a.  The account was created on or around June 24, 2015 in the name of "WILLIAM HITCHINGS".  The account was associated with the email address w.hitchings@gmail.com.

b.  The o0bc0o Skype account user exchanged hundreds of chat messages directly with other users (hereinafter referred to as "User Chats").  These User Chats included the exchange of text messages, image and video files, and live video calls (of which the content could not be provided by Microsoft Corporation).  At least approximately 14 of the image and video files sent by the o0bc0o Skype account user depicted HITCHINGS.

c.  The User Chats revealed that on or around February 16, 2020, the o0bc0o Skype account user exchanged messages with another user who will be referred to for purposes of this Affidavit as "Skype User-1".  These User Chats included the exchange of this Affidavit as "Skype User-1".  The o0bc0o Skype user and Skype User-1 discussed a website that promoted individuals who have a sexual fetish in gear, which they referred to as a gear fetish or "GF".  During the exchange, the o0bc0o Skype user sent a picture of a server that was consistent with some of the pictures recovered from the SUBJECT VERIZON CLOUD ACCOUNT.  The o0bc0o Skype user made comments indicating that this server had a large storage capacity that could host the gear fetish website.  Below are excerpts from this chat:

| | |
|---|---|
| o0bc0o: | idk if I said before, but I have the means to kickstart a site and host it free and clear of everyone else. |
| o0bc0o: | idk if gf domain is available, and the variations off gearfetish don't play out so well |
| o0bc0o: | *Sends image of a computer server* |
| o0bc0o: | this is growing.  2torage is now redundant at 100tb |
| Skype User-1: | Oh really? |
| o0bc0o: | two cables lines and a metro E leased line.  I can literally recreate GF and handle the traffic. |

    i.    Based on my training and experience, I know that 100 terabytes (TB) consists a very large amount of computer data.  A typical hard drive in a laptop or computer is generally 500 gigabytes (GB) to two TB.

d.    The User Chats revealed that during the approximate time period of March 16, 2019 through February 2, 2020, the o0bc0o Skype user exchanged messages with another user who will be referred to for purposes of this Affidavit at "Skype User-2".  During their communications, they appeared to communicate about child pornography and drug activities.  These communications included the following:

    i.    The o0bc0o Skype user and Skype User-2 made comments indicating that they also communicated with each other via the Telegram, Wickr, and Kik smartphone messenger applications.  There were also times when Skype User-2 sent the o0bc0o Skype user sharing links to Mega accounts.  Based on the context of the communications, it appeared that the o0bc0o Skype user and Skype User-2 may have also traded child pornography files with each other via Telegram, Wickr, Kik, and/or Mega sharing links.  By way of example, on or around January 25, 2020, Skype User-2 sent the o0bc0o Skype user a sharing link to a Mega account.  Skype User-2 thereafter stated the following:  "Here to keep that cock hard, have you found any groups here wickr or kik try to find more pedos[1]".

    ii.    During the approximate time period of May 7, 2019 through May 9, 2019, the o0bc0o Skype user made comments indicating that administrators of the Mega cloud storage service had found child pornography files in his Mega account and closed the account.  The o0bc0o Skype user talked about his fears that law enforcement officers would execute a search warrant at his residence, and he also expressed thoughts of committing suicide.  The o0bc0o Skype user made comments indicating that he thought he had taken necessary precautions to prevent his accounts from being detected.  The

---

1 Based on my training and experience, I know that "pedo" is a term to refer to a pedophile or an individual who has a sexual attraction to children.

o0bc0o Skype user also made comments about how law enforcement officers would not find anything on his computer media if a search warrant was in fact executed at his residence. Furthermore, the o0bc0o Skype user talked about how law enforcement officers previously executed a search warrant on a prior residence and did not locate any evidence. Based on my training and experience, these comments are consistent with someone who stores child pornography files on a cloud service and/or a server and/or possesses devices that utilize encryption. Below are excerpts from these communications:

| | |
|---|---|
| o0bc0o: | Mega flagged my account |
| o0bc0o: | I'm out of this forever my homey. |
| Skype User-2: | Which one? |
| o0bc0o: | It doesn't matter. |
| Skype User-2: | What |
| Skype User-2: | Don't leave me |
| Skype User-2: | Lol |
| Skype User-2: | Will Miss you after all those years |
| o0bc0o: | check all your shit |
| o0bc0o: | check it |
| o0bc0o: | methinks there are those among us...fucking with shit |
| Skype User-2: | What?? |
| Skype User-2: | Your ok |
| o0bc0o: | no, I'm not ok |
| Skype User-2: | What's going on |
| Skype User-2: | You scare me like this |
| o0bc0o: | Mega account got flagged |
| o0bc0o: | gave me a warning by email |
| o0bc0o: | second email 3 days ago, I just found it. |
| o0bc0o: | DIDN'T KNOW THEY COULD LOOK AT YOUR ENCRYPTED STORAGE |
| Skype User-2: | Damn close it and delete |
| o0bc0o: | generic threat went out. They know who I am. |
| o0bc0o: | they have DIRECT connection between the account and a paypal! |
| o0bc0o: | But if they sent out an email saying warning, then... |
| o0bc0o: | the second email they deleted the account....hold on I'll fucking show you |
| o0bc0o: | *Sends partial excerpt from an email that appears to be from the Mega website, addressed to aaggll@yahoo.com. Below is an excerpt from this message:* |

"Recently you were sent an email advising that your account was found to contain copies of files that were reported to as being

29

objectionable under Section 31(1)(A) of the New Zealand Films, Videos, and Publications Classification Act 1993. In particular, this relates to depictions of sexual conduct with or by children, or young persons (Section 3(3)(a)(iv)), which is an offense carrying potentially lengthy prison sentences in your jurisdiction."

| | |
|---|---|
| Skype User-2: | Which account was it your cp account? |
| o0bc0o: | Yes. |
| o0bc0o: | The email says |
| o0bc0o: | WE DELETED IT |
| o0bc0o: | DONT DO IT AGAIN |
| o0bc0o: | DONT COME BACK TO MEGA |
| oObc0o: | I paid for premium service, that goes back to my name. |
| o0bc0o: | Now…would I get a heads up if they were about to raid me? |
| o0bc0o: | no, of course not. |
| o0bc0o: | and how expensive would it be to give me a week heads up to dump all physical anythings? |
| o0bc0o: | and THEN Raid me? |
| o0bc0o: | very unlikely. I'm not that interesting. |
| Skype User-2: | Have you deleted your account yet? |
| o0bc0o: | YUes |
| Skype User-2: | Fuck |
| o0bc0o: | but it doesn't mean it's not archived, on ice for someone to look at down the road |
| o0bc0o: | There's not data on any systems or disk I possess. If they raid me if they fuck with me, it'll be a pain in the ass, but ultimately yield a bunch of shit it would cost a fortune for them to hold me to charge wise. |
| o0bc0o: | sigh |
| Skype User-2: | Positive thinking |
| o0bc0o: | I thought I knew all the ins and outs. |
| o0bc0o: | I fucking know security |
| Skype User-2: | You will be fine |
| o0bc0o: | I don't know where I lapsed. |
| o0bc0o: | I might not |
| Skype User 2: | Exactly |
| Skype User 2: | Exactly |
| o0bc0o: | You see, this happened before, the attorney general in my parents home state…raided my childhook home |
| o0bc0o: | did I ever tell you this? |
| Skype User-2: | No |
| o0bc0o: | They raided a home that had been vacant for 2 years. |
| o0bc0o: | they raided looking for a single video download |

30

| | |
|---|---|
| o0bc0o: | ONE tagged download from emule or some shit. |
| o0bc0o: | ONE BY FILE NAME |
| Skype User-2: | When was that |
| o0bc0o: | years ago.  The house was empty. |
| o0bc0o: | So they went down the street where my family had their new house |
| o0bc0o: | got a new warrant |
| Skype User-2: | Did they find you ,? |
| o0bc0o: | took all their shit.  Had to give it back because theyere was nothing to find |
| | . . . . . |
| o0bc0o: | even if I turn out safe…and take every precaution… |
| Skype User-2: | Always |
| o0bc0o: | how the fuck will I know I can stop looking over my shoulder. |
| o0bc0o: | I fucking cant |
| o0bc0o: | I almost shot myself yesterday. |
| o0bc0o: | I almost blew my brains out |
| Skype User-2: | With drugs I hope |
| o0bc0o: | No, with a fucking nine mill. |
| Skype User-2: | Fuck no |
| o0bc0o: | Oh god I wanted to so bad. |
| Skype User-2: | Don't do that |
| o0bc0o: | so much to lose |
| Skype User-2: | A waist of a nice cock and body lol |
| o0bc0o: | Could be very real. |
| o0bc0o: | Not knowing if a bunch of armed men might show up ANY TIME for YEARS to come… |
| o0bc0o: | I will never sleep again. |
| o0bc0o: | And I've been carrying my firearm again. |
| Skype User-2: | Move to another state |
| o0bc0o: | doesn't work like that |
| o0bc0o: | They know where I am |
| | . . . . . |
| o0bc0o: | cops…federal agents…these people LIVE to kill people like me. |
| o0bc0o: | and child porn is what ANY good Christian police type will kill over. |
| | . . . . . |
| o0bc0o: | Everyone around here gets followed. |
| o0bc0o: | sometimes stopped, yes. |
| o0bc0o: | I should just start killing them |
| o0bc0o: | slam the brakes on and be like OMG OFFICER I DIDN'T SEE YOU THERE |

31

| | |
|---|---|
| o0bc0o: | a deer came across the road |
| o0bc0o: | and when he approaches the car |
| Skype User-2: | Don't do that you will be inside st least lots if boys to fuck |
| o0bc0o: | shotgun blast the pig in the face. |
| Skype User-2: | Messy |
| o0bc0o: | turns me the fuck on |
| o0bc0o: | I hate them |
| o0bc0o: | stealing my life. |

iii.   On or around January 19, 2020, the o0bc0o Skype user talked to Skype User-2 about his apparent sexual interest in the children of a man with whom he had a sexual relationship. These comments included the following:

| | |
|---|---|
| o0bc0o: | an unexpected surprise. The boy I was fucking I thought gave me HIV, he's sort of here all the time now. Body looks like a cut 16 year old. Had a couple daughters and talks to me about wanting to fuck them, things of that nature. Very bi, very suggestible, does what I tell him to do. |
| o0bc0o: | Anyway, he's into it, so fresh files, very helpful in encouraging that behavior |
| | . . . . . |
| o0bc0o: | he doesn't seem to mind camming. Thought I'd take him into a cam session of pedos and make him represent me |
| Skype User-2: | Mmmm good fuck toy, you may get him knotted mm |
| o0bc0o: | I will teach him about k9 |
| o0bc0o: | and if he has any kids, I'm going to get inside of them too. |
| o0bc0o: | he might be a connection to that world |
| o0bc0o: | *Emoticon* |
| Skype User-2: | Make sure you going to film that for me |
| Skype User-2: | All of it |
| o0bc0o: | yup |

iv.   On or around February 2, 2020, the o0bc0o Skype user made comments indicating that he was in possession of controlled substances. The o0bc0o Skype user also made comments indicating that he had shown child pornography to his "runner"[2]. Below are excerpts from this conversation:

---

2 Based on my training and experience, I know that individuals involved in drug trafficking offenses use the term "runner" to refer to individuals who transport drugs for them.

| | |
|---|---|
| Skype User-2: | What's happening any good porn |
| o0bc0o: | nah. |
| o0bc0o: | I got a TINY bit of drugs though. |
| Skype User-2: | Mmm so you getting high …nice |
| o0bc0o: | *Sends image of a crystal-like substance that appears consistent with methamphetamine* |
| o0bc0o: | Two ounces |
| Skype User-2: | Mmm |
| Skype User-2: | Party time |
| o0bc0o: | All the time because it pretty much refills itself |
| o0bc0o: | I also made gummy bears |
| o0bc0o: | Anyone and everyone who eats one of them unavoidable becomes unconscious for 4 to 6 hours |
| Skype User-2: | Nice way to rape hehe |
| o0bc0o: | Like this stuff is stronger than valium or xanax |
| o0bc0o: | Yah |
| o0bc0o: | Def for rapes |
| o0bc0o: | Hehe |
| Skype User-2: | Nice any coming over |
| Skype User-2: | Who are the lucky ones to be used hehe |
| Skype User-2: | Lifeless fuck toy cum dump |
| o0bc0o: | *Sends video file depicting what appears to be HITCHINGS having anal intercourse with another male* |
| | . . . . . |
| Skype User-2: | Mmm nice which bitch is that |
| o0bc0o: | My runner. |
| o0bc0o: | He gets what I need |
| Skype User-2: | Your load lol |
| o0bc0o: | Hah among other things |
| o0bc0o: | He likes girls and guys. |
| o0bc0o: | Not so sure about boys |
| o0bc0o: | But I make him watch it. |
| Skype User-2: | Mmm horny what you show him |
| Skype User-2: | Hsrd fucking or just boys playing |
| o0bc0o: | Toddler. Rapey stuff. |
| o0bc0o: | Hard fucking or just bored is playing? When do I just watch them play? That's not good enough. I always watch them fuck. |

### Other Records

85.   Based on review of a police report of the West Milton (Ohio) Police Department, I learned that on or around January 15, 2017, a police officer was dispatched to a residence in West

33

Milton, Ohio. The occupant reported that his son had located an abandoned cellular telephone on a nearby street. This abandoned cellular telephone was turned over to the officer. The officer thereafter received a telephone call from HITCHINGS, who reported that he was the owner of the abandoned telephone. The officer requested that HITCHINGS provide proof that he was the owner of the telephone. A few weeks later, an officer released the telephone to HITCHINGS (although the report did not detail what proof, if any, that HITCHINGS provided that he was the owner of the telephone). HITCHINGS signed a property receipt for the telephone. On this receipt, he identified that his telephone number was the TARGET CELL PHONE.

86. Records from the Ohio Bureau of Motor Vehicles identified that HITCHINGS utilized the SUBJECT PREMISES (the address associated with the TARGET CELL PHONE) on his current Ohio driver's license. Records from the Ohio Bureau of Motor Vehicles identified that a 2011 Chevrolet Tahoe (hereinafter referred to as the "SUBJECT VEHICLE") is registered to HITCHINGS at the SUBJECT PREMISES.

87. Records from the Ohio Bureau of Motor Vehicles identified that three other individuals utilized the SUBJECT PREMISES on their current Ohio driver's licenses: SWEENEY, RYAN WESTENDORF (hereinafter referred to as "WESTENDORF"), and ANDREW BAKER (hereinafter referred to as "BAKER"). Records from the Miami County (Ohio) Auditor's website identified that SWEENEY presently owns the SUBJECT PREMISES.

## Business Records

88. Records from the Ohio Secretary of State identified that SWEENEY registered two business trade names in 2013: Sweeney Communications and Clear Voice One. The registration paperwork identified that the business address for both businesses was the SUBJECT PREMISES. The paperwork identified that the general nature of the Sweeney Communications business was "Communications Equipment Sales and Service and Computer Network Sales and Service". The paperwork identified that the general nature of the Clear Voice One business was "VOIP Phone Systems". The trade name for Clear Voice One expired and was cancelled by the Secretary of State in 2018.

89. Records from the Ohio Secretary of State also identified that in 2013, SWEENEY filed Articles of Incorporation for a business with the name of East Main Technologies. SWEENEY was listed as the statutory agent for this business, and his address was listed as being the SUBJECT PREMISES.

90. As part of the investigation, I have accessed various Internet websites that provide information about businesses. One of these websites (www.buzzfile.com) identified that Sweeney Communications, which also operates under the name of Clear Voice One, operates in the local and long distance telephone communications business. Another website (www.zoominfo.com) identified that Clear Voice One provides low cost Voice Over Internet Protocol (VOIP) phone services to businesses and residences.

91.   A website was located for what appeared to be SWEENEY's Clear Voice One business at www.clearvoice1.com. However, this website is not currently operational. A Facebook social media account was located for Clear Voice One, but there were not any public postings to this account since 2017. No websites were located for Sweeney Communications.

92.   An operational website was located for East Main Technologies at www.eastmaintech.com. According to this website, the company provides various computer services to businesses and residences, such as network monitoring, cloud backup, peripheral support, anti-virus protection, workstations, and other management of servers. A Facebook account was also located for East Main Technologies.

93.   Social media accounts were located on the publicly available information of the Facebook, Instagram, and Twitter websites that appear to be utilized by SWEENEY. Postings were found on these websites indicating that SWEENEY was employed at Walmart. No recent postings were found indicating that SWEENEY worked at or operated East Main Technologies, Clear Voice One, or Sweeney Communications.

94.   A social media account was located on the publicly available information of the Facebook website that appeared to be utilized by WESTENDORF. The profile page for the account indicated that WESTENDORF was employed in Client/Vendor Relations, Systems Support, and "Dog Mother" for East Main Technologies as well as in Sales, Technical Support, and Graphic Design for Clear Voice One.

95.   The publicly available information of the Facebook account with the vanity name of whitchings was located and reviewed. No information was located on this account indicating that HITCHINGS worked or operated East Main Technologies, Clear Voice One, or Sweeney Communications.

96.   As part of the investigation, an FBI Task Force Officer contacted the City of Troy (Ohio) Income Tax Department. A representative from the Income Tax Department provided the following information:

    a.   The City of Troy Income Tax Department has not received any business income tax returns for Clear Voice One, Sweeney Communications, or East Main Technologies. It should be noted that business tax returns are not required for businesses if they are operated by sole owners. In such cases, the owner is required to report his/her business income on a Schedule C of his/her federal returns. The City of Troy requests that the Schedule C's be attached to the city returns.

    b.   The City of Troy Income Tax Department has received personal tax returns from SWEENEY. His 2019 return identified that he had a business loss of approximately $7,000. However, his Schedule C did not identify the name or type of business that generated this loss. Returns that the City of Troy Income Tax Department received from SWEENEY prior to 2019 did not include any Schedule C forms, indicating that

he did not have any business income or losses.

    c.    The City of Troy Income Tax Department has not received any personal tax returns for HITCHINGS or WESTENDORF in any previous tax years.

97. Based on the information detailed above, some of the computer servers depicted in the images and videos recovered from the SUBJECT VERIZON CLOUD ACCOUNT could be related to the current or historical operation of the Clear Voice One, Sweeney Communications, and/or East Main Technologies businesses. However, based on the information detailed above, these businesses either do not appear to be currently operational and/or do not appear to be generating any profits or significant income.

98. Based on the images and videos recovered from the SUBJECT VERIZON CLOUD ACCOUNT and the o0bc0o Skype account, it appears that HITCHINGS regularly uses computer equipment (including the servers) located in the basement of the SUBJECT PREMISES. No images were recovered from the SUBJECT VERIZON CLOUD account that depicted SWEENEY using the computer equipment in the basement. As detailed above, the user of the o0bc0o Skype account talked about using his server to operate a website that promotes individuals having a sexual fetish in gear. Also as detailed above, the user of the o0bc0o Skype account made comments consistent with someone who maintains child pornography files on cloud accounts and/or servers. Furthermore, again as detailed above, Adult Male A reported that HITCHINGS utilized computer media in the basement of the SUBJECT PREMISES to show Adult Male A videos depicting child pornography and to download child pornography files onto a computer that was given to Adult Male A.

99. Based on the information detailed above, HITCHINGS appears to be the primary user of the computer and electronic media located in the basement of the SUBJECT PREMISES. HITCHINGS does not appear to have any association with the operation of SWEENEY's businesses. Based on all of the information detailed in the Affidavit, there is probable cause to believe that the computer and electronic media located in the basement of the SUBJECT PREMISES contain evidence of HITCHINGS' child pornography activities.

Surveillance Activities

100. An FBI Task Force Officer and I have driven by the SUBJECT PREMISES on a number of occasions. During these times, the following was noted:

    a.    The location of the SUBJECT PREMISES is consistent with the description provided by Adult Male A of HITCHINGS' residence.

    b.    The SUBJECT VEHICLE has been consistently parked in the driveway of the SUBJECT PREMISES, as recently as on or around February 3, 2021.

    c.    A vehicle registered to SWEENEY has also been parked in the driveway of the SUBJECT PREMISES on several occasions. A vehicle registered to BAKER has

36

not been seen at the SUBJECT PREMISES on any occasions.

d.     There are a number of surveillance cameras attached to the **SUBJECT RESIDENCE** that appear to capture all sides of the residence.

### Conclusion Regarding Use of Accounts

101.   Based on all of the information detailed in the Affidavit, there is probable cause to believe that HITCHINGS is the user of the following:

a.     The TARGET CELL PHONE and the SUBJECT VERIZON CLOUD ACCOUNT;

b.     The email addresses w.hitchings@gmail.com, **hitchingsw@gmail.com**, and wenglebot@yahoo.com;

c.     The Facebook account associated with the email address **hitchingsw@gmail.com** and the vanity name of **whitchings**; and

d.     The o0bc0o Skype account.

102.   Also based on all of the information detailed in the Affidavit, I submit that there is probable cause to believe the following:

a.     HITCHINGS has used computer devices (including the TARGET CELL PHONE and other computer and electronic media located at the SUBJECT PREMISES) to possess, receive, and distribute child pornography files.

b.     HITCHINGS has possessed controlled substances.

### Evidence Available in Email and Social Media Accounts

103.   Based on my training and experience, I know that individuals involved in child exploitation activities sometimes post pictures and videos of their victims on their social media accounts. Although the pictures and videos posted by the offenders often do not depict child pornography, these files may provide evidentiary value to child exploitation investigations in that they may be partially comparable to the child pornography files (i.e., they may depict the same clothing items, body types, etc.) and/or they may help in identifying the victims.

104.   Based on my training and experience, I know that individuals involved in drug offenses often take pictures of their controlled substances and drug paraphernalia. Individuals often post these pictures on their social media accounts, and they sometimes email these pictures to themselves or others.

105. I also know, based on my training and experience, that individuals often post on their social media accounts pictures of their residences, travels, and whereabouts. Individuals also post information and exchange messages regarding their travels and whereabouts. These pictures and postings again may provide evidentiary value to child exploitation and drug investigations in that they may help to identify the locations of the criminal activities.

106. In my experience, individuals often post information on their social media accounts about other electronic accounts that they utilize – including their email addresses, other social media accounts, and messenger accounts. This information may provide evidentiary value to child exploitation and drug investigations in that they help in identifying other accounts utilized by the offenders in furtherance of their child exploitation and drug activities.

107. Based on my training and experience, I am aware that individuals involved in child exploitation schemes often communicate with others involved in similar offenses about their victims and sexual activities via e-mail, social media accounts, and online chat programs. I have seen examples of cases where such individuals have communicated with other child predators about their sexual fantasies and prior sexual activities with juveniles. I have also seen cases where such individuals have communicated with others about their remorse and regret for their activities. Both types of communications provide material evidence in child exploitation cases in that they provide admissions of guilt.

108. Also in my experience, individuals involved in child exploitation schemes often utilize email, social media, and online chat programs as a means to locate and recruit victims. They then use the chat functions on these and other websites, as well as email accounts, to communicate with their victims. Such communications provide a means of anonymity to protect the subjects' identities and to conceal the communications from the victims' parents.

109. Based on my training and experience, I am aware that individuals involved in drug offenses often communicate with co-conspirators (including suppliers and customers) via e-mail, social media accounts, and online chat programs. Individuals often utilize messenger applications (including messenger applications associated with their social media accounts) to coordinate various aspects of their drug activities (such as purchases and sales).

110. Based on my training and experience, I know that individuals involved in child pornography offenses often obtain and trade images with each other via a variety of means, including email, social media accounts, photo sharing services, and online chat programs. Individuals also often attempt to obtain child pornography from a variety of sources, including from those with whom they communicate via email, social media sites, Internet chat programs, Internet bulletin boards, Internet Peer-to-Peer file sharing programs, Internet websites, and other sources. I have also seen a number of cases in which individuals email files containing child pornography to themselves – either from one email account to another or from and to the same email account – in order to transfer the files from one electronic device to another.

38

111.    Based on my training and experience, one or more aliases are often used by individuals
        involved in child exploitation and drug offenses as a means to avoid detection from law
        enforcement. It is not uncommon for such offenders to create multiple identities, sometimes
        involving different ages and genders. Child exploitation offenders sometimes fictitiously
        portray themselves as juveniles as a means to gain trust and rapport with victims. Child
        exploitation offenders also sometimes obtain photographs of other individuals from the
        Internet to use as their profile pictures and/or to send to the victims.

112.    Based on my training and experience, I know that many social media accounts, Internet
        websites, and telephone providers require users to provide their email accounts when
        registering for the accounts. The social media and Internet account providers then send the
        users various notifications regarding messages from other users, information accessed by
        users, information available by the websites, and other information. Telephone providers
        often send bills to their customers via email. These messages can provide material evidence
        in cases involving child exploitation and drug offenses because they help in identifying what
        social media, Internet accounts, and telephone account that were utilized by the subjects to
        communicate with other subjects and victims and what accounts were utilized by the
        subjects to find child pornography. In addition, the messages help in identifying the
        identities of other subjects and victims.

113.    Based on my training and experience, I know that providers of cellular telephone service and
        Internet Service Providers typically send their customers monthly billing statements and
        other records. These statements and records are sometimes mailed to the customers' billing
        addresses and other times are emailed to the customers' email accounts. These documents
        can be materially relevant to investigations of child exploitation and drug offenses in that
        they provide evidence of the Internet and cellular telephone accounts utilized in furtherance
        of the crimes.

114.    Also as noted above, email providers maintain various subscriber and user information that
        their users provide when registering for its accounts. Some email providers also require
        payment for certain services or features. Such information is materially important in cases
        where online accounts are utilized to trade child pornography and/or purchase controlled
        substances, as this information can help in confirming the identities of the individuals using
        the accounts and committing the offenses.

115.    Email providers maintain various logs of IP addresses utilized to access the accounts. The
        IP information is again materially important in child pornography and drug investigations.
        This information helps in identifying the subjects and the locations where their computer
        devices are located.

### Evidence Sought in Other Google Accounts

116.    Google LLC has the ability to maintain information associated with the Web and
        Application history of its users. Such information is materially relevant in child exploitation

investigations, as it may help in identifying websites used by subjects to obtain child pornography and locate victims.

117.   Based on my training and experience, I know that individuals involved in drug offenses sometimes conduct Internet searches related to their drug activities, such as the prices of drugs and materials utilized in manufacturing the drugs. The Web and Application history maintained by Google LLC is therefore also materially relevant to drug investigations.

118.   Google Drive and Google Photos provide users with cloud computing and online file storage (as detailed above) and photo storage services. In my experience, individuals often back up the photographs and videos on their telephones to their Google Photos account. Therefore, any photographs and videos taken with or stored on users' telephones (including child pornography files and photographs depicting controlled substances) may also be recovered on their Google Drive and Google Photos account. Furthermore, in my experience, individuals with large collections of child pornography may utilize cloud computing and online storage accounts as a means to store their files after their hard drives become full. In addition, individuals utilize these services as a means to conceal their files from others, including law enforcement.

119.   As noted above, based on my training and experience, I know that individuals involved in drug offenses often take pictures of their controlled substances and drug paraphernalia. It is not uncommon for these types of photographs to be backed up to the individuals' cloud accounts, such as Google Drive and Google Photos.

120.   Google Android Backup provides users with the ability to backup data on their cellular telephones and other electronic devices. Such data can be materially relevant in cases in which cellular telephones and other electronic devices are used to commit child exploitation and drug offenses, as this data may provide historical records of their criminal activities that are no longer saved on the devices.

121.   As detailed above, Google Location History is an application in which Google utilizes various data such as cell site information and Wi-Fi routers to locate and geo-locate a cellular telephone device. Google collects and stores this data if the application is enabled by the user, either during the set-up of the device or through the device's settings.

122.   Based on my training and experience, I know that location information from cellular telephones and Google accounts can be materially relevant in investigations involving child exploitation and drug offenses. This information provides evidence of the travels undertaken by the subject when meeting with possible victims and co-conspirators. Data regarding the subjects' whereabouts as obtained from location information can corroborate statements made by the subjects and victims and provide evidence of the locations where the criminal activities took place. Furthermore, data regarding the subjects' whereabouts as obtained from the location information can lead to the identification of the places where computer devices used in furtherance of the crime may be present.

40

Conclusion Regarding Probable Cause

123. Based on all of the information detailed above, there is probable cause to believe the following:

a. The Google account associated with the email address **hitchingsw@gmail.com** may contain evidence of HITCHINGS' child pornography and drug activities.

b. The Facebook account associated with the email address of **hitchingsw@gmail.com** and the vanity name of **whitchings** may contain evidence of HITCHINGS' child pornography and drug activities.

## ELECTRONIC COMMUNICATIONS PRIVACY ACT

124. I anticipate executing the requested warrants for the listed accounts under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require Google LLC and Facebook Inc. to disclose to the government copies of the records and other information (including the contents of communications) particularly described in Section I of Attachments B-1 through B-2. Upon receipt of the information described in Section I of Attachments B-1 through B-42, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1 through B-2.

41

## CONCLUSION

125. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; property designed for use, intended for use, or used in committing a crime of violations of federal law; including violations of 18 U.S.C. §§ 2252(a)(4)(B) and (b)(1), 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(1), 18 U.S.C. §§ 2252(a)(2) and (b)(1), 18 U.S.C. §§ 2252A(a)(2) and (b)(1), and 21 U.S.C. § U.S.C. § 844, are present in the information associated with the above noted accounts (as described in Attachments A-1 through A-2).

126. I, therefore, respectfully request that the attached warrants be issued authorizing the search and seizure of the items listed in Attachments B-1 through B-2.

127. Because the warrants for the accounts described in Attachments A-1 through A-2 will be served on Google LLC and Facebook Inc., who will then compile the requested records at times convenient to those entities, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

Special Agent Andrea R. Kinzig
Federal Bureau of Investigation

SUBSCRIBED and SWORN
before me this 4TH of February 2021

ELIZABETH A. PRESTON DEAVERS
UNITED STATES MAGISTRATE COURT JUDGE

42